**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KEVIN L. GARRETT, ) | |
| ) | CASE NO. 5:14CV1066 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE DONALD C. NUGENT |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
|   Acting Commissioner of Social ) | |
|   Security ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff Kevin L. Garrett ("Garrett") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

**I. Procedural History**

On April 29, 2011, Garrett filed an application for SSI alleging a disability onset date of June 1, 2002 and claiming he was disabled due to "chronic pain, depression, anxiety, hypertension, spinal." (Tr. 15, 196, 222-223.) His application was denied both initially and upon reconsideration.

On November 30, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Garrett, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr.

31-78.) On December 27, 2012, the ALJ found Garrett was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 15-25.) The ALJ's decision became final when the Appeals Council denied further review.[1] (Tr. 1-3.)

## II.  Evidence

*Personal and Vocational Evidence*

Age forty-eight (48) at the time of his administrative hearing, Garrett is a "younger" person under social security regulations. *See* 20 C.F.R. § 416.963 (c) & Tr. 41. He has a 7th grade education and past relevant work as a general laborer. (Tr. 41, 70.)

*Relevant Medical Evidence*

Garrett underwent x-rays of his left knee on August 27, 2001, which showed mild degenerative changes and evidence of joint effusion. (Tr. 377.) There is then an eight year gap in Garrett's treatment records. (Tr. 331.) On October 6, 2009, Garrett presented to John Gashash, M.D., with complaints of neck pain; right side neck discomfort of one month duration; low back pain; left radicular pain and numbness of three week duration; and, a history of rheumatoid arthritis. (Tr. 331.) He also reported that he smoked about a half a pack of cigarettes a day. *Id.* On examination, Dr. Gashash noted diffuse discomfort and tenderness in Garrett's neck, as well as limitation of motion in all directions (mainly to the right side). *Id.* He ordered x-rays of Garrett's chest and cervical and lumbar spines; and, prescribed Flexeril, Neurontin, and Enbrel. *Id.*

Garrett's chest x-ray was normal. (Tr. 345.) The x-ray of his lumbar spine showed

---

[1] In the decision, the ALJ noted Garrett had filed several prior applications for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income, and that all were denied. (Tr. 15.) Garrett's most recent prior application was filed on March 9, 2010 for SSI, with an amended onset date to match the application date. *Id.* This application was denied in an ALJ decision dated April 18, 2011. *Id.* The ALJ decision at issue herein found that Garrett had introduced "new and material evidence . . . that pertains to a period after the prior [April 18, 2011] decision regarding the claimant's impairments." *Id.* The ALJ then explained as follows: "Although the evidence generally supports the prior residual functional capacity, there is new evidence of a breathing impairment. Based on this new and material evidence, I find that the claimant's residual functional capacity has changed since the prior decision." *Id.*

degenerative changes, including narrowing of the L5-S1 disc space; anterior endplate spurs from L2-S1; and calcifications of the anterior longitudinal ligament at L3-L4 and L4-L5. *Id.* The x-ray of Garrett's cervical spine revealed mild cervical spondylosis at C4-C5 and C5-C6. (Tr. 345-346.) Dr. Gashash then ordered Garrett to undergo MRIs of his cervical and lumbar spines. (Tr. 330.) The lumbar spine MRI showed severe foraminal stenosis at L5-S1 bilaterally. (Tr. 341.) The cervical spine MRI confirmed mild cervical spondylosis at C4-C5 and C5-C6. (Tr. 340.) Dr. Gashash thereafter prescribed Vicodin. (Tr. 329-330.)

On March 5, 2010, Garrett presented to the Emergency Room ("ER") with complaints of lower back pain radiating down his left leg. (Tr. 317-319.) He rated his pain a 4 on a scale of 10. (Tr. 318.) The ER doctor assessed acute exacerbation of chronic back pain without neurologic deficit; and, spinal stenosis. (Tr. 317.) Garrett was discharged with a prescription for Percocet. (Tr. 317.) He followed up several days later, on March 8, 2010, at which time Dr. Gashash assessed low back pain with severe bilateral foraminal stenosis at L5-S1 and bipolar depression. (Tr. 328.) He continued Garrett's prescriptions for Vicodin, and also noted Garrett had been prescribed Celexa, Xanax, and Vistaril by the Crisis Center. *Id.*

Garrett returned to Dr. Gashash on May 3, 2010. (Tr. 327.) Dr. Gashash noted "previously demonstrated impairment in severe limitation of motion, lower back pain, numbness in lower extremities, neck pain." *Id.* He noted, without further explanation, that Garrett was "using [a] cane." *Id.* Dr. Gashash also remarked that Garrett "does have questionnaire showing his capacity with impairment of inability to lift anything between 1-5 pounds only rarely, difficulty stooping and difficulty performing any activity, concentrating, interaction with people impaired."[2] *Id.* He assessed "severe impairment due to spinal stenosis, cervical spondylosis." *Id.*

---

[2] This treatment note states "please see completed questionnaire." (Tr. 327.) However, Garrett does not direct this Court's attention to any completed disability questionnaire in the record from this time period. Garrett, in fact, fails to include a Statement of the Facts in his Brief on the Merits, although expressly required to do so by this Court's Initial Order. (Doc. No. 5 at 2.) Plaintiff's counsel is reminded of his obligation to comply with the requirements of this Initial Order in all future social security briefing before this Court.

On July 12, 2011, state agency physician Elizabeth Das, M.D., reviewed Garrett's medical records and completed a Physical Residual Functional Capacity ("RFC ") Assessment. (Tr. 104-105.) She concluded Garrett was capable of lifting and/or carrying 20 pounds occasionally; standing and/or walking for a total of 2 hours in an 8 hour work day; and, sitting for a total of 6 hours in an 8 hour work day. (Tr. 104.) In addition, Dr. Das found Garrett could not operate left foot controls and could not work in proximity to unprotected heights. (Tr. 105.) She further assessed that Garrett could never climb ramps, stairs, ladders, ropes, or scaffolds; and never kneel or crawl. *Id.* She found he could occasionally stoop and crouch.[3] *Id.*

State agency physician Nick Albert, M.D., reviewed Garrett's medical records and completed a Physical RFC Assessment on November 3, 2011. ( Tr. 116-118.) He reached the same conclusions regarding Garrett's functional physical capabilities as Dr. Das. *Id.*

Meanwhile, on October 11, 2011, Garrett presented to Arnold Rosenblatt, M.D., complaining of back pain and breathing problems. (Tr. 399.) With regard to his back pain, Garrett stated he had injured his back ten years ago and "still ha[d] a lot of pain in his back with trouble moving and bending." *Id.* On examination, Dr. Rosenblatt noted tenderness in Garrett's back; and, positive straight leg raising. *Id.* With regard to Garrett's breathing problems, Garrett reported he had recently been diagnosed with emphysema. *Id.* Subsequent to this diagnosis, Garrett indicated he stopped smoking after 32 years of smoking a pack to a pack and a half per day. *Id.* Garrett indicated he is now "short of breath all the time." *Id.* He reported taking Albuterol and Ventolin, as well as two other medications he could not remember the names of. *Id.* Dr. Rosenblatt referred Garrett for x-rays and lab work. *Id.*

Garrett returned to Dr. Rosenblatt on October 19, 2011. (Tr. 398.) At this time, Dr. Roseblatt found Garrett had bilateral foramen stenosis at L4-5. *Id.* Although Garrett's chest x-ray and lab work were negative, Dr. Rosenblatt detected slight wheezing on examination and noted Garrett was "very short of breath when he walked here." *Id.* Dr. Rosenblatt prescribed

---

[3] Dr. Das noted that her opinion adopted the RFC set forth in the previous ALJ decision dated April 18, 2011. (Tr. 105.)

4

Symbicort (one puff twice daily) and Albuterol (2 puffs every 4 hours) for Garrett's breathing problems, and Meloxicam for his back pain. *Id.*

On November 1, 2011, Garrett presented to Dr. Rosenblatt and requested a prescription for a "breathing machine." (Tr. 397.) When Dr. Rosenblatt asked for clarification, Garrett became indignant and rude, and stated he would find another physician. *Id.* Shortly thereafter, on November 9, 2011, Garrett presented to John Schuster, M.D., with "lots of concerns." (Tr. 395-396.) Garrett's biggest concern was his pulmonary status. He reported he had moved into a vacant home that was "run down, dusty, and moldy and he thinks since then he has had a lot more breathing problems." (Tr. 395.) Garrett stated he had been in the ER on four separate occasions for this condition (most recently in September 2011) and "each time he gets a nebulizer treatment and is sent out." *Id.* Garrett also expressed concern that he may have sleep apnea. *Id.* Garrett's other primary concern was his back pain, which he believed "is the result of multiple injuries including a fall from a 35-foot high cliff, a fall off a roof and when he was much younger a fall from a railroad car onto a spike that hit his back." *Id.*

On examination, Dr. Schuster noted significant rhinitis and "some expiratory rhonchi posteriorly." *Id.* He also observed "marked tenderness in [Garrett's] lower back." *Id.* Dr. Schuster prescribed a three week course of steroids, noting Garrett "did stop smoking after 1 of his emergency room visits." *Id.* In addition, Dr. Schuster prescribed Neurontin for Garrett's spinal stenosis and Nexium for his complaints of acid reflux. (Tr. 396.)

Garrett returned to Dr. Schuster on November 30, 2011. (Tr. 394.) He reported that his "pulmonary problem is a lot better with the course of steroids and now he has his Spiriva inhaler along with his Ventolin inhaler." *Id.* On examination, Dr. Schuster noted Garrett's lungs were "much improved with no adventitious sounds at all." *Id.* He concluded Garrett's COPD was "much better with the course of steroids" and continued him on his breathing medications. *Id.* With regard to Garrett's back pain, Dr. Schuster noted Garrett was "definitely uncomfortable particularly when he tries to move about." *Id.* He continued Garrett's Neurontin prescription and added Ibuprogen 800 mg. once daily if needed. *Id.* Dr. Schuster also prescribed Elavil to help with Garrett's insomnia, irritability, and depression. *Id.*

5

That same day, Dr. Schuster completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 364-367.) Therein, he found Garrett could lift and/or carry less than 10 pounds (both occasionally and frequently); stand and/or walk less than 2 hours in an 8 hour workday; and, sit less than about 6 hours in an 8 hour workday. (Tr. 364-365.) Dr. Schuster concluded Garrett's push/pull capacity was limited in his lower extremities due to "spinal stenosis with significant back and leg pain despite medical treatment." (Tr. 365.) He found Garrett could never climb ramps, stairs, ladders, ropes or scaffolds; and, could never balance, kneel, crouch, crawl or stoop. *Id*. Dr. Schuster concluded Garrett was limited to occasional reaching in all directions. (Tr. 366.) Finally, Dr. Schuster found Garrett required limited exposure to temperature extremes; dust; humidity/wetness; hazards (machinery, heights . . . ); and, fumes, odors, chemicals, and gases, due to his "COPD with exacerbation by above factors" and "spinal stenosis." (Tr. 367.)

On February 1, 2012, Garrett presented to Dr. Schuster and reported that "he has much more stamina, endurance, and is no longer restricted by his previous breathing problems." (Tr. 393.) He also indicated he had been "taking his medicine faithfully." *Id.* Dr. Schuster found Garrett's lungs were "free of adventitious sounds" and concluded the "current combination of [his] meds clearly has improved him significantly." *Id*. He continued the same medications and dosages and "insist[ed] that [Garrett] remain an ex-smoker." *Id*.

On April 25, 2012, Garrett returned "tearful and really clearly emotional upset" because the "the home that he has invested a fair amount of supplies and time in fixing up for a friend has mold in it because of a leaky roof and now the friend is evicting him." (Tr. 392.) Garrett reported feeling "a lot more congested" and stated his girlfriend "hears him wheezing at night." *Id*. Dr. Schuster heard some expiratory rhonchi and wheezes on auscultation and signs of increased upper respiratory congestion. *Id.* He prescribed Singulair along with Garrett's inhalers and advised him to vacate the property and avoid the mold exposure. *Id.* Dr. Schuster also switched Garrett from Elavil to Cymbalta for his anxiety and depression. *Id.*

Garrett returned to Dr. Schuster a month later and reported he was living in a tent by a river. (Tr. 391.) He stated he had been lighting a fire to cook and keep the mosquitoes away,

6

and feared the smoke had been irritating to his respiratory tract. *Id*. Dr. Schuster noted Garrett's lungs were "free of adventitious sounds" and concluded he was "overall . . .somewhat better despite the homelessness and stress." *Id.* He continued Garrett on the same medications. *Id.*

Garrett presented to Dr. Schuster on June 27, 2012, "despondent [and] tearful" due to the denial of his Social Security application and the loss of his medical card. (Tr. 390.) He reported that he had resumed smoking for "a couple days." *Id.* Dr. Schuster noted Garrett "reports his breathing is much worse and when I enter the room he is hyperventilating, but the longer we talk the more controlled and natural his breathing becomes." *Id.* Garrett indicated he went to the ER twice for shortness of breath and was given a prescription for Prednisone, which he could not afford to fill. *Id*. Dr. Schuster noted a chest x-ray was taken during the ER visit, which was unremarkable. *Id*. On examination, Dr. Schuster found Garrett's lungs were "entirely clear without adventitious sounds." *Id*. He also observed abrasions on Garrett's knees, at which time Garrett advised he was hit from behind by a car while he was riding a bike collecting cans. *Id*. Dr. Schuster increased Garrett's Cymbalta and prescribed Remeron and Flexeril. *Id.* He continued Garrett's COPD medications, noting "[a]t this point, I think most of his breathing problems are related to his emotional status." *Id.*

On July 11, 2012, Garrett presented to Dr. Schuster and reported that "[for] the past 3 days he has not had any medicine for his nebulizer" and "has had a lot more congested feeling in his chest and has been awakening at night with coughing at least 3 -4 times." (Tr. 389.) Dr. Schuster detected "some coarse rhonchi in posterior lung fields" but no wheezing. *Id*. He assessed bronchial congestion and prescribed Organidin. *Id*. He also "put him on some ipratropium bromide and albuterol sulfate inhalation solution 0.5mg/3 mg" twice daily. *Id*.

On August 9, 2012, Garrett was hospitalized for an acute COPD exacerbation. (Tr. 379-385.) On admission, he reported that "about 4 days ago he ran out of his home medications that he takes for breathing treatments, and about 2 days ago, he started developing this difficulty in breathing that has progressively been worsening." (Tr. 383.) Garrett also indicated that, although he quit smoking a year previously, he "still smokes occasionally, and . . . has a lot of exposure to secondhand smoke as well." *Id*. He specifically stated he had smoked the day

7

before, "which also worsened his symptoms." *Id*. Examination revealed "occasional wheezes auscultated;" limited diaphragmatic excursion; and, decreased air exchange. (Tr. 384.) A chest x-ray was taken, which showed "no acute process and no interval change, the lungs are hyperinflated, and no acute infiltrate." (Tr. 385.) An EKG was normal. (Tr. 379, 381.) He was started on breathing treatments, antibiotics, and Percocet (for back pain). *Id*.

Garrett was discharged on August 11, 2012 with diagnoses of acute COPD exacerbation, bronchitis, and active smoker. (Tr. 379.) It was noted that, after treatment, his symptoms improved and his oxygen saturation was more than 90% on room air. *Id*. He was prescribed Prednisone and Vibramycin and ordered to continue his home medications. *Id*.

On August 22, 2012, Garrett presented to Dr. Schuster for follow-up. (Tr. 388.) Dr. Schuster noted Garrett's lungs were "free of adventitious sounds" and concluded his chronic pulmonary disease "seems stable on the regimen outlined including prn use of Ventolin inhaler, Symbicort inhaler twice daily, and Singular 10 mg daily." *Id*. A handwritten note dated August 28, 2012 states that Garrett called to advise he was approved for medical insurance and, therefore, would no longer be treating with Dr. Schuster. *Id.*

On September 26, 2012, Garrett presented for treatment with Jeffery Duffey, M.D. (Tr. 406.) Dr. Duffey noted "occasional end inspiratory wheezing and prolonged expiratory phase" but 98% pulse oximetry on room air. *Id.* He assessed COPD, history of sleep apnea, and degenerative joint disease. *Id*. Dr. Duffey continued Garrett on his "current medications" and prescribed a sleep study. *Id*. A prescription label is contained in the record for "iprat-albut 0.5-3 (2.5) mg/3ml" with instructions to "inhale contents of 1 vial four times a day in nebulizer." (Tr. 401.) This label identifies Dr. Duffey as the prescribing doctor and is dated as having been filled by Garrett on September 26, 2012. *Id.*

Garrett returned to Dr. Duffey on October 15, 2012, with complaints of bilateral arm and leg itching and rash. (Tr. 405.) He did not report any breathing difficulties at this time and Dr. Duffey noted that Garrett's heart and lungs were "normal." *Id.*

8

*Hearing Testimony*

During the November 30, 2012 hearing, Garrett testified as follows:

- He left school after the 7th grade because he could not get along with his teachers or fellow students. He was in special education classes. He "can't read all that well" and is not very good at math. He never attempted to get a GED and has had no further education or training. (Tr. 41-42.)

- He lives in a one-story home with a female friend. She does all the grocery shopping, cooking, and cleaning. (Tr. 40, 44, 60.)

- He has not worked in ten years. He worked in the past as a pipe threader and doing maintenance and clean-up. His last job was in basement waterproofing. He has been fired from every job he ever had because he could not get along with people. (Tr. 44-46.)

- He is in the early stages of cirrhosis of the liver because he "drank a lot growing up" due to his mental problems. He gave up drinking when he was diagnosed with cirrhosis. He experiences back pain, stomach swelling, and weight gain as a result this condition. (Tr. 42, 58.)

- He has suffered from lower back pain ever since he injured his back ten years ago working at the railroad. He described the pain as sharp, stabbing, and constant; and, rated it a 4 or 5 on a scale of 10. The pain radiates down his left leg, causing pain in his hip and knee and numbness in his leg and feet on the left side. The numbness is constant and "sometimes it gets so bad it feels like [his toes] are frostbit." (Tr. 46-49.)

- His back pain makes it difficult for him to sit, stand, and bend. Bending, in particular, aggravates his condition. The pain has gotten worse over the years and makes it harder for him to do things like go to the store or sweep the floor. Generally, he has to lay down in order to relieve the pain. (Tr. 47-48.)

- He has problems with his knee and his neck. He had knee surgery over ten years ago and then re-injured it. He was told to wear an ACL brace on his knee "because it wants to buckle backwards on me." (Tr. 51.) He cannot afford the brace, however, so he wraps his knee to prevent it from buckling. If it does buckle on him, he is "definitely laid up for about three or four weeks." (Tr. 51.) He also suffers from pain in his neck that radiates into his left arm "all the way to the fingers." (Tr. 51-52.) He experiences sharp pain in his neck two to three times per week, "like somebody stabbed you or something." (Tr. 52.)

- Sitting causes his back to ache "really bad." He can sit for 15 to 20 minutes before needing to stand. He does not know how far he can walk before taking a break, but he does not think he can walk far. His left knee buckles when he walks and he has fallen down a few times. He cannot lift or carry "very much at all." (Tr. 61-62.)

- He has a cane at home but he is embarrassed to use it when he leaves the house. He does use the cane to get around at home. (Tr. 43.)

- He was a smoker but quit when he was diagnosed with emphysema over a year ago. He experiences shortness of breath and his lungs "start to get heavy." (Tr. 56, 58.) He feels shortness of breath "even when he's just sitting there." *Id.*

9

> > These episodes occur four to six times per day. He uses one of his inhalers five to seven times per day. He also has a nebulizer, which he uses five to six times every day. It takes 20 to 30 minutes each time he uses his nebulizer. (Tr. 56-57.) He used his inhaler during the hearing. (Tr. 62.)
>
> - He has "really bad sleep apnea" that causes him to "quit breathing at night." (Tr. 54.) He also has difficulty sleeping due to his back pain and breathing difficulties. (Tr. 54, 56.) He gets about five hours of sleep per night. (Tr. 54.)
>
> - He suffers from anxiety and depression. He has been taking medication for these conditions for the last couple years, which have been helping. If he does not take his medications, he experiences shaking and crying spells. (Tr. 53-54.) He has always had difficulty getting along with people. He does not have any friends (aside from the friend he lives with) and he does not go anywhere. (Tr. 54-55.)
>
> - He takes a number of different medications, including Gabapentin, Amitriptyline, Ventolin, Symbicort, as well as unidentified medication for his mental impairments. (Tr. 50.) Side effects from these medications include fatigue. *Id.*
>
> - During the day, he does jigsaw puzzles, talks to his friend, and watches some television. (Tr. 59.) He has no hobbies. He does not go to church or leave the house very often. (Tr. 43, 59-60.)

The VE testified Garrett had past relevant work as a general laborer. (Tr. 70.) The ALJ then posed the following hypothetical:

> All right. If we had a hypothetical individual with the same age, education, work experience as the claimant– this hypothetical would be limited to light work except they could only stand and/or walk two hours in an eight-hour day. They should operate no left foot controls; never – occasionally climb ramps and stairs; never ladders, ropes, or scaffolds; never kneel, crawl; occasionally stoop, crouch, and bend. They should avoid all exposure to hazards, such as unprotected heights and dangerous machinery. They should avoid concentrated exposure to temperature extremes, including humidity. They should also avoid concentrated exposure to respiratory irritants, such as fumes, dust, gas, odors, poor ventilation. Simple, routine tasks with no strict time or high production quotas in a static environment where changes would be infrequent and they would be demonstrated and explained. And though I already said no strict time or high instruction quotas, just to reiterate, no assembly line or piece work is sort of what I'm referring to there.

(Tr. 70-71.) The VE testified the hypothetical individual could only perform work at the sedentary level, and identified the following three representative jobs: (1) order clerk; (2) electronic inspector; and, (3) final assembler. (Tr. 71-72.)

The ALJ then modified the above hypothetical "from light to sedentary with the lifting of 10 pounds; stand/walk two hours; sit six hours; and retained all the other limitations." (Tr. 72.) The VE testified that the individual would be able to perform the previously identified sedentary jobs. (Tr. 72-73.) The ALJ then asked: "What if I added in frequent superficial interaction with

others? Superficial meaning work in the same area but no negotiation, arbitration, conflict resolution, direction, management, or group tasks." (Tr. 73.) The VE testified the individual would be able to perform the same three previously identified jobs. *Id.*

  The ALJ then asked the following series of questions:

Q:  Okay. What if this individual required a sit-stand option every 30 minutes?

A:  Well, as long as they do not leave the work station– as long as there's no interruption of their work pace, in general, in the sedentary exertional level, that's allowed.

  * * *

Q:  Okay. And what is the generally accepted or tolerated rate for an individual being off task?

A:  For the unskilled jobs, that would be no more than– borderline considered is 8 percent.

Q:  Okay. And absent?

A:  Twice a month, Your Honor.

(Tr. 73.) The ALJ then added frequent handling and reaching with the left upper extremity to the first hypothetical. *Id.* The VE testified "there would be no change." (Tr. 74.) Finally, the ALJ asked: "If this individual can never climb ramps, stairs, ropes, ladders, scaffolds but everything else would remain the same in hypothetical number 1, would you jobs you cited remain– electronics inspector, order clerk, final assembler?" (Tr. 77.) The VE testified that they would. *Id.*

  Garrett's attorney then posed the following hypothetical to the VE:

Q:  * * * Individual– claimant can perform sedentary work with the following limitations. Okay? Claimant must be allowed to be off task four to five times per day for at least 20 to 30 minutes at a time to use his nebulizer. Claimant must periodically alternate sitting and standing to relieve pain and discomfort. Claimant can never operate foot controls. Claimant can occasionally reach with his – occasionally reach in all directions but never over his left – never over shoulder level with his left arm. Claimant cannot – can have moderate exposure to temperature extremes, dust, humidity, wetness, fumes, odors, chemicals, and gases. Any jobs?

A:  No. There would be no competitive employment.

Q:  Because of the use of the nebulizer; is that correct?

11

      A:       Because the off the task.

      Q:       Off task four to five times so they could use the nebulizer?

      A:       That's correct.

(Tr. 76-77.)

### III. Standard for Disability

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found Garrett established medically determinable, severe impairments, due to chronic obstructive pulmonary disease (COPD); status post left knee anterior cruciate ligament (ACL) reconstruction in 1991 with residuals, including left knee grade II ACL rupture and meniscus tear; adjustment disorder; borderline intellectual functioning; personality disorder; history of polysubstance abuse; left shoulder de Quervain's tenosynovitis; and, degenerative disc disease; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17-19.) Garrett was found incapable of

performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 19-25.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Garrett was not disabled.  (Tr. 24-25.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

13

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *RFC Assessment/Hypothetical Question*

In his sole assignment of error, Garrett claims the ALJ erred because "while the ALJ acknowledged plaintiff's testimony that he needed to self-administer breathing treatments numerous times per day, and occasionally use a cane, these additional significant work-related limitations were not addressed or analyzed in the ALJ's RFC, or included in his hypothetical queries to the vocational expert." (Doc. No. 12 at 4.)  The Commissioner asserts Garrett's argument is unavailing because the medical evidence does not support Garrett's testimony regarding "needing twenty minutes to administer his breathing treatments or the allegation made in Mr. Garrett's brief about occasional use of a cane." (Doc. No. 13 at 2.)

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

### *Nebulizer Treatments*

Garrett first asserts the ALJ failed to "analyze the practical effect" of nebulizer treatments on his ability to work. He emphasizes his hearing testimony that he needs to use his nebulizer five to six times per day and each treatment lasts 20 to 30 minutes. (Tr. 57.) Garrett's brief notes that he was hospitalized for an exacerbation for his COPD in August 2012 and states "it also appears that he was using the nebulizer as early as July 2012."[4] (Doc. No. 12 at 6.) He

---

[4] Garrett does not provide any citation to the record for this statement, nor does he include a Statement of Facts in his Brief with appropriate citations to the transcript. Upon its own careful review of the record, the Court notes Garrett presented to Dr. Schuster on July 11, 2012 complaining that he had run out of medicine for his nebulizer. (Tr. 389.) Dr. Schuster prescribed ipratropium bromide and albuterol sulfate inhalation solution 0.5mg/3 mg twice daily. *Id.* Although not apparent from Dr. Schuster's treatment note, it appears that albuterol sulfate

15

points out that, in September 2012, he filled a prescription for nebulizer medication to be taken four times a day. (Tr. 401.)  This medical evidence, Garrett claims, supports his testimony that he needs to use his nebulizer "multiple times a day." (Doc. No. 12 at 7.)  Garrett argues the ALJ failed to "analyze the practical effect [of his nebulizer treatments] on his ability to work, did not explicitly reject plaintiff's [hearing] testimony, and, most importantly, did not discuss the vocational expert's testimony that it would prevent competitive employment." *Id.*

The Commissioner argues there is no medical evidence to substantiate Garrett's allegations that his nebulizer treatments would last 20 to 30 minutes or that all four treatments would need to be administered during work hours.  (Doc. No. 13 at 11.)  Thus, the Commissioner asserts the ALJ "had no obligation to include that factor in either his RFC finding or in the hypothetical questions he posed to the vocational expert." *Id*. at 12.

In the decision, the ALJ acknowledged Garrett's hearing testimony that he feels short of breath up to six times per day (even when he is not active); uses a nebulizer 5 to 6 times per day every day; and, has one inhaler that he uses seven times daily.  (Tr. 20.)  The decision also discussed, at length, the medical evidence regarding Garrett's COPD, including his treatment for this condition with Drs. Rosenblatt, Schuster, and Duffey.  (Tr. 21-22.)  The ALJ then determined that Garrett's medically determinable impairments could reasonably be expected to cause his alleged symptoms; but found his statements concerning the intensity, persistence and limiting effects of these symptoms to be not entirely credible.  (Tr. 21.)  In this regard, the ALJ noted evidence in the record indicating that Garrett was treated conservatively for his conditions; demonstrated a good response to medication; and, "was able to ride a bicycle, cook over a campfire, fish, put puzzles together, play cards, and care for [his girlfriend's] [grand]children." (Tr. 23.)

The ALJ then formulated the following RFC:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

---

inhalation solution is used in nebulizer treatments. *See* http://www.webmd.com/drugs/2/drug-4872-3008/albuterol-sulfate-inhalation/albuterolsalbutamolsolution-inhalation/details.

> 416.967(b) except he could stand and walk for 2 hours and sit for 6 hours in a normal workday. He could never use left foot controls. The claimant could occasionally climb ramps and stairs but never ladders, ropes or scaffolds. He could never kneel or crawl but could occasionally stoop. crouch and bend. He must avoid all exposure to hazards (unprotected heights and dangerous machinery). He must avoid concentrated exposure to temperature extremes and humidity along with respiratory irritants such as fumes, dusts, gases, odors, and poor ventilation. He is limited to simple, routine tasks with no strict time or high production quotas, and no assembly line or piece rate work. He requires a static work environment where changes would be infrequent and they would be demonstrated and explained. He could have frequent, superficial interaction with others, defined as work in same area but no arbitration, negotiation, conflict resolution, direction, management or group tasks.

(Tr. 19.) The ALJ found the above RFC "accommodates the claimant's subjective complaints to the extent they are supported by the medical evidence" and "[t]here is nothing in the record that justifies any further reduction in the [RFC] contained herein." (Tr. 23.) The decision then found Garrett could not perform his past relevant work as a general laborer, but could perform the jobs of order clerk, electronics inspector, and final assembler. (Tr. 23-24.)

The Court finds the ALJ did not err in failing to account for Garrett's frequent nebulizer use in the RFC. Although Garrett testified that he used his nebulizer five to six times per day and each treatment lasted 20 to 30 minutes, he has not directed this Court's attention to any medical evidence in the record substantiating this testimony. In his July 11, 2012 treatment note, Dr. Schuster indicates Garrett had run out of his nebulizer medicine and prescribes albuterol sulfate inhalation solution, which appears to be used for nebulizer treatments. (Tr. 389.) However, this treatment note states the albuterol sulfate inhalation solution was to be used twice per day, not five to six times per day as indicated by Garrett during the hearing. Moreover, it does not indicate how long each nebulizer treatment would last nor does it provide any indication regarding the timing of Garrett's daily nebulizer treatments. Specifically, Dr. Schuster's treatment note does not indicate whether Garrett would be required to take his nebulizer treatment(s) during the average eight hour workday. Further, while Dr. Schuster did offer an opinion regarding Garrett's physical functional abilities that included limitations relating to his pulmonary condition, that opinion does not discuss Garrett's continuing need for a

nebulizer or state that Garrett would be off task due to frequent nebulizer use.[5] (Tr. 364-367.)

Garrett is correct that, in September 2012, Dr. Duffey appeared to prescribe nebulizer treatments four times per day. (Tr. 401.) However, this prescription was for a 90 day course of treatment[6] with only one authorized refill, resulting in a total of 180 days (or 6 months) of nebulizer treatments at the rate of four per day. *Id*. Moreover, there is no indication in either the prescription label or Dr. Duffey's treatment notes that each nebulizer treatment would take 20 to 30 minutes to administer. (Tr. 401, 405-406.) Nor is there any indication regarding whether Garrett would be required to take some or all of his nebulizer treatments during the course of the workday.

Thus, Garrett's hearing testimony is the only evidence in the record that he needed to use his nebulizer five to six times per day and that each treatment lasted 20 to 30 minutes. Although the ALJ acknowledged this testimony, he expressly found Garrett was "not entirely credible," concluding "the treatment record does not support the claimant's allegations of disabling symptoms." (Tr. 21, 23.) Garrett does not challenge the ALJ's credibility finding. Rather, Garrett appears to ask this Court to re-weight the evidence and reach a different conclusion. However, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material

---

[5] The ALJ accorded only "some weight" to Dr. Schuster's opinion, noting that: "Although Dr. Schuster is a treating source, he only began treating the claimant a few weeks before the assessment was completed and he did not have a longitudinal treatment history. Further, the claimant's condition improved in just a few weeks with medication" (Tr. 22.) Garrett does not challenge the ALJ's assessment of Dr. Schuster's opinion.

[6] Specifically, the prescription states "[i]nhale contents of 1 vial four times a day in nebulizer" and indicates a quantity of 360 vials. (Tr. 401.) Assuming use of four vials per day, this translates into a 90 day supply of vials.

18

conflicts in testimony, or assess credibility.")

Here, the ALJ fully considered the medical evidence regarding Garrett's COPD and supported his RFC determination with reference to specific evidence in the record. As discussed above, the medical record does not substantiate Garrett's claim that he needed to use his nebulizer five to six times per day and each treatment lasted 20 to 30 minutes. Thus, the ALJ was not required to account for the frequent nebulizer use claimed by Garrett in the RFC. Nor, therefore, was the ALJ required to incorporate limitations relating to such nebulizer use into the hypothetical questions posed to the VE.

Accordingly, this argument is without merit.

*Use of a Cane*

Garrett next argues the ALJ failed to take into account his "occasional need to use a cane." (Doc. No. 12 at 9.) He asserts that "[t]his limitation is of critical importance here because . . . all of the jobs identified by the vocational expert required frequent reaching or handling," which Garrett claims he would not be able to do when using a cane. *Id*. at 10-11.

The Commissioner asserts the medical record does not substantiate Garrett's claims regarding his use of a cane. She notes that none of Garrett's doctors prescribed a cane or indicated he needed to use one. Moreover, the Commissioner argues Garrett's own hearing testimony indicates "that he used a cane sparingly, if at all." (Doc. No. 13 at 13.) Thus, the Commissioner argues the ALJ had "nothing to evaluate regarding use of a cane" and did not err in failing to account for use of an assistive device in the RFC or hypotheticals.

The Court agrees with the Commissioner. Garrett directs the Court's attention to only one piece of medical evidence relating to his use of a cane. This evidence consists of a treatment note by Dr. Schuster dated May 3, 2010, in which Dr. Schuster notes, in passing, that Garrett is "using cane." (Tr. 327.) There is no indication in this treatment note that Dr. Schuster prescribed Garrett a cane or concluded a cane was medically necessary. Nor is there any mention of a cane in any of Dr. Schuster's subsequent treatment notes, or in his November 2011 opinion. Moreover, Garrett does not argue that any of his other physicians' treatment notes contain references to his need for or use of a cane.

19

The only evidence that Garrett required the use of a cane was his somewhat equivocal hearing testimony that he uses a cane at home. (Tr. 43.) The ALJ discussed this testimony along with Garrett's testimony regarding his back pain and leg numbness. (Tr. 21.) The decision recounted, at length, the medical evidence regarding Garrett's degenerative disc disease. (Tr. 21-22.) As discussed above, the ALJ ultimately found Garrett's statements regarding the limiting effects of his impairments to be lacking in credibility, a finding which Garrett does not challenge herein. Given the paucity of evidence presented regarding Garrett's alleged need for a cane, the Court finds the ALJ did not err in failing to account for it in the RFC.

Accordingly, the Court finds this argument to be without merit.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision should be AFFIRMED.

s/ Greg White
United States Magistrate Judge

Date: May 6, 2015

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**